IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 8, 2020

**STATE OF TENNESSEE v. JAMARIAN CORTEZ JORDAN**

**Appeal from the Circuit Court for Madison County**
**No. 18-382   Roy B. Morgan, Jr., Judge**

_____

**No. W2019-01230-CCA-R3-CD**

_____

The Madison County Grand Jury indicted Defendant, Jamarian Cortez Jordan, for aggravated robbery, and a jury convicted Defendant as charged.  The trial court sentenced Defendant to ten years' incarceration with an eighty-five percent release eligibility.  On appeal, Defendant argues (1) that the trial court erred by failing to suppress Defendant's confession, (2) that the evidence was insufficient to support his conviction, (3) that Defendant did not have a fair and impartial jury, (4) that the trial court erred in refusing to allow Defendant's mother to testify at trial as to Defendant's disability, (5) that Defendant should have received the minimum sentence, and (6) that the trial court erred in denying Defendant's motion for new trial.  After a thorough review of the record and applicable case law, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Marcus Mariah Reaves, Denmark, Tennessee, for the appellant, Jamarian Cortez Jordan.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Jody Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

*Motion to Suppress*

Defendant filed a motion to suppress his confession to police officers, arguing that his confession was not freely and voluntarily given, and the trial court held a hearing on Defendant's motion.

Ron Pugh testified that he worked as an investigator in the major crimes unit of the Jackson Police Department. Investigator Pugh said that he investigated an aggravated robbery on Idlewild Street that occurred March 21, 2018. While testifying, he identified Defendant as the suspect in the case. Investigator Pugh stated that he interviewed Defendant two days after the offense. He said that Defendant did not appear to be under the influence of "anything that would inhibit his ability to know, understand[,] or waive his rights." Investigator Pugh went over each of Defendant's *Miranda* rights orally and in writing, and Defendant indicated that he understood those rights. Investigator Pugh testified that Defendant signed a written waiver of his rights and agreed to speak to police.

Investigator Pugh stated that, during the course of Defendant's interview, Investigator Pugh wrote down Defendant's statement, and Defendant signed it. Investigator Pugh testified that he never made any promises or threats to Defendant about what would happen if he did not provide a statement.

Investigator Pugh said that, before Defendant sat down in the interview room, he told Investigator Pugh that the robbery was his idea, that he did it on his own, and that his sister had nothing to do with it. Defendant asked about his sister, Jamaya Jordan. Investigator Pugh stated that, at the time of Defendant's interview, Ms. Jordan had also been arrested in connection with the aggravated robbery, as well as Victor Harris. Investigator Pugh stated that he had probable cause to arrest Ms. Jordan because she was in the car with Defendant close in time and location to where the robbery occurred. Investigator Pugh said that

> [t]he victim had given a description of the vehicle and the driver of the vehicle and the suspect, and the officers located that vehicle stopped with the person [whom the victim] said was driving was driving, the person [whom the victim] said was in the car was in the car, the gun [that the victim] said was used was in the car, and the amount of money [that the victim] said was taken was in the car.

- 2 -

Investigator Pugh testified that, after Ms. Jordan was arrested, she was released without charge. Investigator Pugh never indicated to Defendant that Ms. Jordan would be charged unless Defendant gave a full confession. He never told Defendant that he was thinking about charging Ms. Jordan but was going to change his mind based on what Defendant said.

On cross-examination, Investigator Pugh testified that, when Defendant and Ms. Jordan were arrested, he first interviewed Ms. Jordan. The next day, Investigator Pugh interviewed Defendant, after which time Ms. Jordan was released. Investigator Pugh stated that he did not know whether Defendant and Mr. Harris were housed together while they were in custody.

The trial court noted "that [D]efendant is saying the statement was not intelligently, freely and voluntarily given because of pressure placed upon him by his sister being implicated in the charges." The trial court remarked that, several times during Defendant's interview, he stated "I'm going to be honest. I want y'all to know." The trial court said that, in Defendant's interview, Defendant agreed that Ms. Jordan was driving the car but insisted that she did not know anything about the robbery. The trial court found Investigator Pugh's testimony to be credible. It stated:

> [Defendant] had an attitude of wanting to talk, and it was clear from the statement [that] it was his own free volition that he made these statements, no pressure put upon him or threats made by law enforcement. He talked about every aspect, from the driver of the car, to the gun, to [Mr. Harris], he covered it all, and many, many times again said that he wanted officers, investigators to know the honest truth about it.

The trial court found Defendant's confession to be freely, voluntarily, knowingly, and intelligently given and denied Defendant's motion to suppress.

*Voir Dire*

During voir dire, the trial court questioned a juror. The juror said that she knew defense witness Yolanda Johnson, Defendant's mother. She said that she and Ms. Johnson worked at Walgreens together six to eight months prior to trial, that they worked on different shifts, and that they were both present at Walgreens for approximately one hour each day. The juror stated that she worked in the pharmacy at Walgreens, and Ms. Johnson "worked out front." The following exchange occurred:

THE COURT: Was one a supervisor over the other?

- 3 -

[THE JUROR]: Well, [Ms. Johnson] worked out front, so I don't know if it would be considered a supervisor or not.

THE COURT: But in other words, supervising you maybe?

[THE JUROR]: No. . . . I had the pharmacists over me.

THE COURT: . . . So if she testifies, you would have to judge her credibility along with every other witness.

[THE JUROR]: Right.

THE COURT: Can and will you use the same rules in judging that credibility?

[THE JUROR]: Yes, sir.

THE COURT: Now, [Juror], you're not going to hurt anybody's feelings, we know you're going to be honest with us, but are you comfortable that you have no bias or prejudice if she's a witness?

[THE JUROR]: Yes, sir.

THE COURT: And you -- in other words, you're not going to give extra credibility or take away credibility just because she worked in -- at Wal[greens] with you?

[THE JUROR]: Right.

THE COURT: Okay. Anything else apply to you, based upon the discussions we've all had?

[THE JUROR]: No, sir.

THE COURT: So you know right now, [Juror], you can take that oath and your decision will be rendered fairly and impartially as truth and justice dictate in this case, based on the evidence and the law?

[THE JUROR]: Yes, sir.

THE COURT: Okay. And outside the store, y'all had no relationship other than she happened to be there about an hour overlap while you worked?

[THE JUROR]: Yes, sir.

Defendant made no objection to the juror, the trial court seated her, and the jury was sworn.

*Trial*

State's Proof

The victim, Edmund Dotson, testified that he was eighteen years old at the time of trial and that, in March of 2018, he lived in Jackson, Tennessee. He said that, on March 21, 2018, he gave Victor Harris a ride to a residence on Idlewild Street after work to "get some clothes[.]" Mr. Dotson was driving, and Mr. Harris was in the front passenger seat. When they arrived at the Idlewild residence, Mr. Harris exited the vehicle and walked to the trunk of a "white Crown Vic" parked outside the home in the driveway and then went inside the house.

Mr. Dotson remained in the vehicle, and a dark navy "Chevy Malibu" with no tags and a lime green "drive off" sticker blocked him in the driveway from behind. Defendant was in the Malibu in the front passenger's seat. Mr. Dotson saw a female in the driver's seat and another female in the back seat. Mr. Dotson testified that Defendant exited the Malibu, walked to the trunk of the "Crown Vic," and then came to Mr. Dotson's car with a gun in his hand. The gun was black with "a lime green attachment on the – like the aiming part." Defendant pointed the gun at Mr. Dotson and asked him who he was and where he was from. He said that Defendant "robbed [him] at gunpoint, took $400 in cash and two cell phones." Then Defendant told Mr. Dotson, "Get out of the driveway or I'm [going to] shoot you. I'll give you three seconds." The Malibu that had been behind his car was gone. Mr. Dotson testified that he drove away, pulled over at a neighbor's house, and called the police.

On cross-examination, Mr. Dotson testified that he and Mr. Harris had known each other a long time. He recalled telling police officers that he knew Mr. Harris was a member of a gang called the "Vice Lords." Mr. Dotson stated that he had no gang affiliation. He said that he did not know who lived at the Idlewild residence but that he remembered telling officers that he drove Mr. Harris to Mr. Harris's cousin's house. Mr. Dotson testified that, when the robbery occurred, he had "just got[ten] out of juvenile" detention.

- 5 -

Mr. Dotson stated that, when they arrived at the Idlewild residence, Mr. Harris did not go to the trunk of the "white Crown Vic" but instead went into the house. He said that, after Defendant robbed him, Mr. Harris came out of the house and got into a "green" vehicle with Defendant. Mr. Dotson said that he saw Defendant and Mr. Harris "drive off" as he was calling the police from the neighbor's house.

On redirect examination, Mr. Dotson agreed that the statement he gave police immediately following the incident was more likely to be correct than his memory at trial. After refreshing his memory with his police statement, Mr. Dotson agreed that he told police that the color of the Malibu was "gray."

On recross-examination, Mr. Dotson agreed that his police statement did not indicate Defendant went to the trunk of the "Crown Vic."

Kenneth Charles Reeves testified that he was a police officer with the Jackson Police Department and that he responded to a robbery on Idlewild Street in March of 2018. He said that the victim, Edmund Dotson, told him the color of the Malibu was "gray" and that he relayed that information to other officers.

George David Smith testified that he was a domestic violence investigator with the Jackson Police Department and was on "uniform patrol" in March of 2018. Investigator Smith said that he was called to the scene of a robbery and received a description of a "suspect vehicle." Investigator Smith stated that, approximately thirteen minutes from the time he received the call on the robbery, he made a traffic stop on Lincoln Street of a vehicle matching the description of the "suspect vehicle." Investigator Smith said there were five people in the vehicle but that one got out and ran across the street before the traffic stop, "before they knew [Investigator Smith] was after them." The person who got out of the vehicle was later detained. Several units arrived, and Investigator Smith handled the occupant seated behind the driver, Tyler Reece. Investigator Smith said that he saw a gun on the floorboard of the rear passenger seat.

Officer Christian Boxley of the Jackson Police Department testified that he assisted Investigator Smith in the traffic stop on Lincoln Street. He said that he made contact with Mr. Harris and with the driver of the vehicle and that Defendant was seated in the rear passenger seat. Officer Boxley testified that he took several photographs during the traffic stop. He identified the vehicle as a "gray Chevy Malibu" with a white and green temporary tag. Officer Boxley noted a gun under the front passenger seat on the floorboard in plain view and seized the firearm as evidence. He said the gun was "fully loaded" with "one bullet in the chamber."

- 6 -

Officer Kurtis Krohn Stowe of the Jackson Police Department testified that he assisted with a traffic stop on Lincoln Street on March 21, 2018. Officer Stowe took Defendant to his patrol car after the traffic stop and patted him down. Officer Stowe found $506.50 in Defendant's pockets. He then transported Defendant to the police department.

Officer Kelly Mason of the Jackson Police Department testified that he assisted with a traffic stop on Lincoln Street on March 21, 2018, and that Defendant was in the front passenger seat when he arrived. When Officer Mason asked Defendant to step out of the car and frisked him for weapons, he noticed a large bulge in Defendant's front pocket. Defendant told Officer Mason that it was money in the amount of $400. Officer Mason testified that he passed Defendant to other officers and searched the passenger side of the vehicle. When Officer Mason slid the front passenger seat forward, he saw a "Glock handgun laying there in plain view under the seat." Officer Mason did not touch the weapon but waited for other officers to photograph and collect it for evidence. Officer Mason testified that a female was sitting in the rear passenger seat.

Investigator Ron Pugh of the Jackson Police Department Major Crimes Unit testified that he investigated a robbery on Idlewild Street on March 21, 2018, and took the victim's statement. Investigator Pugh showed the victim a photographic line-up of suspects, and the victim selected Defendant as the person who robbed him. Investigator Pugh also interviewed Defendant's sister, Jamaya Jordan. Through his investigation, Investigator Pugh developed Defendant as a suspect. He said Defendant was taken into custody close in time and distance to when and where the robbery occurred.

Two days after the robbery and Defendant's arrest, Investigator Pugh interviewed Defendant. Investigator Pugh said that Defendant did not appear to be under any mind-altering substances at the time of his interview. Investigator Pugh explained Defendant's *Miranda* rights both orally and in writing, and Defendant signed a waiver of his rights. Investigator Pugh stated that Sergeant Mike Thomas was also in the room during Defendant's interview and that the interview was video and audio recorded.

Investigator Pugh wrote down Defendant's statement, read it back to him, and gave him an opportunity to make changes to it. Defendant adopted the statement as his own and initialed the document. It read:

> I went to Idlewild to sell a gun. [Mr. Harris] called me and told me about a dude who wanted to buy one. My sister drove me over there and [Mr.] Reece was in the back seat. They were not involved at all.

We drove up and I got out. I went in the house. I grabbed the gun and went back out. [Mr. Harris] and his brother were inside the house. [The victim] was outside in his car. I actually went over to him to sell the gun but I saw the money he had. I thought about my son's birthday next month and decided to take the money. I pointed the gun in his direction and told him to give me the money. He gave me the money and I told him to leave. He drove away.

I got back in the car [with] my sister and [Mr.] Reece. They didn't know what had happened. [Mr. Harris] came to the car and got in. We drove to Lincoln Court. We picked up my nephew at the Purple Store and took him home. That's where the police stopped us.

The money I took from [the victim] was in my pocket. My sister or [Mr.] Reece or [Mr.] Harris did not have any of the money. I put the gun in the floorboard. I did the robbery on my own. It was just my idea and nobody else was involved.

Investigator Pugh stated that Defendant told him that he had Post-Traumatic Stress Disorder ("PTSD") but that Defendant "didn't use it as an excuse." Investigator Pugh said that, prior to the Defendant giving his statement, Investigator Pugh made no threats or promises regarding any other person found in the vehicle with him at the time of his arrest. Investigator Pugh stated that, prior to Defendant's statement, Mr. Harris and Ms. Jordan were both suspects. Investigator Pugh stated:

When [Defendant] told me that they weren't involved, it was just him, he explained that he put the gun in the floorboard, that the money was in his pocket, they didn't know, it meshed with what they said. And -- and I told him I'm gonna -- I'm gonna cut them loose, and I did that day before lunch.

On cross-examination, Investigator Pugh testified that he video- and audio-recorded each of the interviews of the persons detained from the Malibu. He agreed that he requested all of the car's occupants to be held separately during the investigation but was not sure if they were held separately or not. Investigator Pugh stated that, during Defendant's interview, Defendant stated that he had PTSD, that his PTSD was not included in the written adopted statement, and that Defendant had an opportunity to include the PTSD as an alteration to the written statement but chose not to do so.

<u>Defense Proof</u>

Jamaya Jordan testified that she was Defendant's sister and that she was living with Defendant in March of 2018. On March 21, 2018, Ms. Jordan drove Defendant over to their mother's home on Vance Avenue. On the way to their mother's house, they picked up Mr. Reece. When they arrived at their mother's home, their mother gave Defendant some money.

Later, Mr. Harris "kept calling" Defendant, and Defendant asked Ms. Jordan to take him to his cousin's home to see Mr. Harris. Ms. Jordan, Mr. Reece, and Defendant drove to Ms. Jordan's cousin's home. When they arrived, Mr. Harris was with the victim in the victim's vehicle. Ms. Jordan saw Defendant and Mr. Harris go into the house, but she and Mr. Reece remained in her vehicle where she "was on [her] phone." Later, Defendant and Mr. Harris got into her car; Defendant sat in the front passenger seat, and Mr. Harris sat in the back passenger seat.

She said that, after the victim pulled away, it was approximately "five or ten minutes" later that she was pulled over by police. She said, "We thought it was . . . because . . . at that same moment in time our cousin had got shot." She said that, when they were pulled over, she believed that the police thought that they had "something to do with [their] cousin getting shot." The police approached the back seat passengers and asked for Mr. Harris. Ms. Jordan testified that the police removed the other passengers and that she was still in the car when they searched for the gun. She said the gun was on the floorboard of the back passenger seat when the police found it.

Ms. Jordan said that, when they were taken into custody, "they put all the boys together" but that she was by herself. She said that she was in the cell overnight before she spoke to an investigator. She stated that, when she spoke to investigators, they threatened her with "eight to twelve years" for being a "getaway driver" after the robbery. She told investigators that Defendant did not have a gun when he exited her vehicle or when he returned to her vehicle.

Ms. Jordan stated:

> The whole time we were in there we were communicating. They put my brother in time-out because we wouldn't stop talking through the doors. Um, like, we could – we could see each other, like, through the windows. We would, like – we could hear each other good. We w[ere] having a whole – whole conversations.

Ms. Jordan told Defendant that the officers threatened to charge her as the "getaway driver." She said that she and Defendant had PTSD from being present when her aunt and cousin were killed in a tornado. Ms. Jordan testified that, when she was in custody, she was having panic attacks and that the guards would not check on her until Defendant beat on the doors. She testified that, after two and one-half days in custody, she was released, and Defendant was charged.

On cross-examination, Ms. Jordan stated that Mr. Harris had been calling Defendant "all morning" on the day of the robbery "trying to get us to come over there" to her cousin's residence on Idlewild. She stated that she did not know why they were going to the Idlewild residence and that they were there "not even ten minutes." She said that Mr. Harris and Defendant went into the house but that she remained in the car. She said that she was looking at her phone and never saw a robbery. She said that, when the victim pulled away from the house, the victim looked at her and "did, like, a little nod." Ms. Jordan stated that Defendant got back in the car and started talking about their cousin getting shot and that Defendant did not have a gun. She said, "[I]f [Defendant] would have stuck [the gun] in his pocket I would have seen him, you know. The way they found the gun under the seat, I would have seen him putting it under the seat."

Yolanda Johnson testified that she was Defendant's mother and that, on March 21, 2018, Defendant, Ms. Jordan, and Mr. Reece came to her home on Vance Avenue. She said that she saw them when they arrived at her home and that Ms. Jordan was driving and Defendant was in the front passenger seat. She said that she gave Defendant about $600. Later the same day, she saw Defendant again at her sister's house on Lincoln Street. Ms. Johnson testified that she never saw Defendant with a gun that day. Three days later, Ms. Jordan called Ms. Johnson and asked Ms. Johnson to pick her up from the police department. On cross-examination, Ms. Johnson testified that Defendant completed the eleventh grade and could read and write.

Defendant testified that he was twenty-one at the time of trial. He said that, on the morning of March 21, 2018, Ms. Jordan drove him and Mr. Reece to his mother's house where his mother gave Defendant some money. Defendant said that he received a phone call and asked Ms. Jordan to drive him to Idlewild Street to pick up his friend, Mr. Harris. Defendant stated that he got out of Ms. Jordan's car and saw Mr. Harris get out of a car. They went into the house to speak to Defendant's cousin. Then, he and Mr. Harris got in Ms. Jordan's car and drove away. Defendant said that he did not have a weapon when he came to Idlewild and that he did not get a weapon after he arrived at Idlewild.

Defendant testified that he confessed to investigators because he was "trying to free" Ms. Jordan and his two friends. He said that, while he was in booking, he had a conversation with Mr. Harris and Mr. Reece and that he was able to speak to Ms. Jordan.

He said that, when they were stopped by police, he first noticed the gun after he was out of the car and on the curb. He said that, when he was first stopped by police, he did not know how much money he had because he "was just spending it."

On cross-examination, Defendant agreed that, when he was interviewed, he "couldn't wait to tell the police officers that [he was] the one that did it[.]" He agreed that he either lied during the interview, or he was lying at trial. Defendant stated, "I did lie to free my sister. Yes I did." He agreed that he was in communication with Ms. Jordan, Mr. Harris, and Mr. Reece while in custody and that he was the last person interviewed by police. Defendant denied that he knew what the other three had told police before he was questioned. Defendant said that Ms. Jordan told him that "they were trying to give her eight to twelve years[.]" He stated that, when he and Ms. Jordan communicated through the wall, they said "I love you," and he told her to eat something; however, he did not know what she told investigators regarding the robbery. Defendant said that the "deputies downstairs" did not allow them to have extended conversations and that they broke the jail rules by saying "I love you" to one another.

Defendant agreed that his testimony was that he received $600 from his mother. He said that he came up with a lie about winning $150 in a dice game to make up the difference between the $400 the victim said was stolen and the amount he had in his pocket. Defendant said, "I really [was] just trying to make it sound good[.]"

Regarding Defendant's statement to investigators that he was going to his cousin's house to buy a gun, he said that the story was "just something me and [Mr. Harris] came up with" while they were in jail. He said, "I conversated (sic) with [Mr. Harris] so – so I could get him free." Defendant testified that, when he was arrested, he did not tell Officer Mason that he had $400 in his pocket.

Defendant agreed that he did not speak to the victim before he gave his statement to police; therefore, he concluded it was a coincidence that his confession matched the victim's statement. He said that Mr. Harris had a phone call at the "investigation office" where Mr. Harris may have learned of the victim's statement because Mr. Harris was friends with the victim. He stated that the victim selected him from a line-up because the victim saw him with Mr. Harris.

On redirect examination, Defendant agreed that his confession and the victim's statement had several differences. He agreed that the victim denied saying that the victim was going to purchase a gun and that the victim denied there was a reason for Mr. Harris and Defendant to meet.

On recross-examination, Defendant agreed that he and the victim both told investigators that he arrived at the Idlewild residence with Mr. Harris, that Mr. Harris got out of the victim's car, that Mr. Harris and Defendant went into the house together, that Mr. Harris and Defendant came out of the house together, and that Defendant robbed the victim after Defendant came out of the house.

As a rebuttal witness, the State called Officer Michael Thomas who testified that he assisted Investigator Pugh with interviewing those in custody in the Idlewild robbery investigation. Officer Thomas said that Investigator Pugh never made any threat or promise to Defendant about what kind of charges would be filed or what sentences would be received. He stated that Ms. Jordan never told investigators that she had PTSD, panic attacks, or claustrophobia. Officer Thomas said that he did not detect any mental anguish from Ms. Jordan and that no one threatened Ms. Jordan or made promises to her.

The jury found Defendant guilty of aggravated robbery.

*Sentencing Hearing*

At the sentencing hearing, Defendant testified that he maintained his innocence. He said that he was going to "Pathways" for mental health services for PTSD and was prescribed medication. He stated that he received a two-year sentence for a prior felony and that he completed his sentence in that case.

The trial court noted that Defendant committed the instant offense while out on bond in Case No. 18-559, a 2018 conviction for intent to sell and deliver a Schedule IV controlled substance.

Ms. Johnson testified that Defendant completed the eleventh grade and received disability payments. She said that he had PTSD, bipolar disorder, internal impulse disorder, and severe depression. She stated that Defendant's first mental health diagnosis was in 2005 and that he began receiving medication at the age of nine. Ms. Johnson said that Defendant had one son that was almost two years old. On cross-examination, Ms. Johnson stated that she gave her son $600 on the day of the robbery, despite his multiple mental health issues.

The trial court considered the presentence report, the purposes and principles of sentencing, the evidence at trial, and the arguments of counsel. It applied enhancement factors (1) and (13) "under the circumstances[.]" The trial court found that Defendant was "still youthful but an adult and responsible for his actions and that he has had a history of some issues dealing with his health in the past. The [c]ourt could weigh to some small extent possibly mitigating circumstances regarding those things in this case."

- 12 -

The trial court noted that "a lengthy period of time is necessary to avoid depreciating the seriousness of the offense and to deter others" but also noted that "the minimum is [eight years] and the maximum [twelve years] and this is an [eighty-five] percent release eligibility by statute. So the range is increased already under this particular offense." The trial court found that Defendant had a "minimum risk for future problems based upon the presentence report." The trial court sentenced Defendant, as a Range I offender, to serve ten years in the Tennessee Department of Correction with an eighty-five percent release eligibility and ordered the sentence to run consecutively to Defendant's sentence in Case No. 18-559.

*Motion for New Trial*

Defendant filed a timely motion for new trial, arguing (1) that the verdict was contrary to the weight of the evidence, (2) that the trial court erred by failing to suppress Defendant's confession, (3) that a juror was not impartial because she told the court that she was Ms. Johnson's co-worker and denied that Ms. Johnson was her supervisor, (4) that the trial court erred in refusing to allow Ms. Johnson to testify at trial as to Defendant's mental health issues, (5) that the State's witnesses violated the instructions of the court not to discuss the case while sequestered, and (6) that the victim provided new evidence exculpating Defendant.

At a hearing on Defendant's motion for a new trial, Ms. Johnson testified that she knew the juror questioned by the trial court, because Ms. Johnson was a manager at a Walgreens where the juror worked in the pharmacy. She said that she did not mention this to defense counsel until after trial "[b]ecause the judge had asked her . . . and he didn't ask me[.]" Ms. Johnson stated that the victim approached her in the hallway during trial and that other witnesses were discussing the case in the hallway.

Investigator Pugh testified that he never saw or heard anyone threaten the victim about what would happen if he did not testify against Defendant. He said that he was not aware if the victim had any pending charges in any other jurisdictions. He stated that no one ever offered the victim money to testify against Defendant and that no one called Defendant "an animal."

Investigator Thomas testified that he was present when Investigator Pugh took the victim's statement and that no one threatened the victim about what would happen if he did not testify against Defendant. He said that no one ever offered the victim money to testify against Defendant and that no one called Defendant "an animal." Investigator Thomas stated that he was outside the courtroom during the trial and that he did not observe any witness discussing testimony.

Officer Mason testified that he was outside the courtroom during trial and that he did not observe any witness discussing testimony.

The trial court denied Defendant's motion for a new trial, and Defendant timely appealed.

## Analysis

On appeal, Defendant argues (1) that the trial court erred by failing to suppress Defendant's confession, (2) that the evidence was insufficient to support his conviction, (3) that he did not have a fair and impartial trial because a juror was untruthful during voir dire, (4) that the trial court erred in refusing to allow Ms. Johnson to testify at trial as to Defendant's disability, (5) that Defendant should have received the minimum sentence, and (6) that the trial court erred in denying Defendant's motion for new trial.

The State responds (1) that the trial court properly denied Defendant's motion to suppress his statement to police after finding his confession was freely and voluntarily given, (2) that the evidence was sufficient to support his conviction, (3) that Defendant was not denied his right to a fair trial because the juror was not actually or presumptively biased, (4) that Defendant abandoned his line of questioning of Ms. Johnson by failing to make an offer of proof and thus waived any objection, (5) that the trial court did not abuse its discretion by sentencing Defendant to ten years' incarceration with eighty-five percent release eligibility, and (6) that the trial court properly denied Defendant's motion for new trial.

### I. Motion to Suppress

Defendant claims that the trial court committed reversible error by denying his motion to suppress his statement made to police. He argues that, because Ms. Jordan was threatened with serving eight to twelve years in prison, he was coerced into confessing; therefore, his confession "was not voluntary and [was] false."

The State responds that the trial court accredited Investigator Pugh's testimony that he did not threaten or promise anything to Defendant to encourage a confession. The State also contends that the trial court properly found that Defendant made the statement of his own volition, that there was "no pressure put upon him or threats made by law enforcement," and that Defendant made the statement "freely, voluntarily, knowingly, and intelligently[.]"

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d

18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Daniel*, 12 S.W. 2d 18, 23 (Tenn. 1996)).

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. *Id.* Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained.

*Id.* at 280-81.

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428, 433-35 (2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *Smith*, 933 S.W.2d at 455 (citing *State v. Brimmer*, 876

S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" *Brimmer*, 876 S.W.2d at 79. The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014) (citing *Walton*, 41 S.W.3d at 81; *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *Smith*, 933 S.W.2d at 455; *Self v. State*, 65 Tenn. 244, 253 (Tenn. 1873)). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Id.* at 305 (citing *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993)). A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434).

Here, the trial court accredited Investigator Pugh's testimony at the suppression hearing that no threats or promises were made to Defendant. The trial court found that Defendant understood and freely waived his *Miranda* rights. It noted that Defendant came into the interview "with a positive attitude." It stated, "[Defendant] had an attitude of wanting to talk, and it was clear from the statement [that] it was his own free volition that he made these statements, no pressure put upon him or threats made by law enforcement."

The trial court concluded from the evidence that Defendant "gave his statement intelligently, freely, and voluntarily without duress or coercion." The voluntariness of Defendant's confession is a finding of fact that we will not disturb on appeal unless the evidence preponderates otherwise. *Sanders*, 452 S.W.3d at 306; *Odom*, 928 S.W.2d at 23. Moreover, Defendant offers no evidence of "coercive police activity" which "is a necessary predicate to finding that a confession is not voluntary[.]" *Brimmer*, 876 S.W.2d at 79. Under the strongest legitimate view of the evidence in favor of the State, the evidence does not preponderate against the trial court's findings. The trial court did not err in denying Defendant's motion to suppress, and Defendant is not entitled to relief.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to sustain his conviction because he testified that his confession was false and given to protect his sister. Defendant asserts that he received the money found in his pocket from his mother. He contends that Mr. Harris was seated in the position in the vehicle where the gun was found.

The State responds that Defendant's confession, the amount of money found in Defendant's pocket, the location of the weapon in the vehicle, the apprehension of Defendant close in time and location to the robbery, and the victim's statement and

identification of Defendant from a photographic line-up all support Defendant's conviction. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914.

In order to sustain a conviction, "the proof must be sufficient to support each and every element of the conviction offense." *State v. Parker,* 350 S.W.3d 883, 909 (Tenn. 2011). A reviewing court must examine each element of the offense of which the defendant stands convicted and determine if each element is supported by sufficient evidence. *Id.* "If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction." *Id.* The identity of the perpetrator "is an essential element of any crime." *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence. . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford,* 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, because it saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. *Bland,* 958 S.W.2d at 659. This court will not reweigh the evidence. *Id.* On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques,* 221 S.W.3d 514, 521 (Tenn.2007).

As charged here, aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1) (2018). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2018).

Here, the victim testified that Defendant "robbed [him] at gunpoint, took $400 in cash and two cell phones," and the jury was free to accredit the victim's testimony. Defendant's own testimony placed him at the scene of the crime. Defendant was taken into custody close in time and location to the robbery. A gun was found in the car under the front passenger seat where Defendant was seated. Defendant had over $500 in cash in his pocket and told officers that he won about $100 in a "dice game" earlier that day, with the remaining amount matching the amount that was stolen. The victim selected Defendant from a photographic lineup, and Defendant gave a voluntary confession. The victim's statement matched Defendant's confession on all key points. The evidence was sufficient to support the conviction for aggravated robbery. Defendant is not entitled to relief.

*III. Juror Bias*

Defendant argues that he was denied a fair and impartial trial because juror a juror was untruthful during voir dire. The State responds that the juror was not actually or presumptively biased.

The right to an impartial jury is guaranteed by both the United States Constitution and the Tennessee Constitution. *State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012), *as corrected* (Oct. 10, 2012); U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "A court may discharge from service a grand or petit juror" for any "reasonable or proper cause," including a state of mind which exists on the juror's part "that will prevent the juror from acting impartially[.]" Tenn. Code Ann. § 22-1-105 (2019). A court may dismiss a juror "on account of defect" or "on account of prejudice" which is "actually shown to exist or presumed to exist from circumstances." *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). A defendant "bears the burden of providing a prima facie case of bias or partiality." *Carruthers v. State*, 145 S.W.3d 85, 95 (Tenn. Crim. App. 2003) (citing *Akins,* 867 S.W.2d at 355).

"When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Akins*, 867 S.W.2d at 355 (citing *Durham v. State,* 188 S.W.2d 555, 559 (Tenn. 1945)). "[W]hen a juror's voir dire responses are false or misleading, intent is not dispositive of

the issue, and a mistaken answer also raises the presumption of bias." *State v. Willie Calvin Taylor, Jr.*, No. W2011-00671-CCA-R3CD, 2012 WL 2308088, at *8 (Tenn. Crim. App. June 18, 2012) (citing *Akins.* 867 S.W.2d at 356 n. 15), *no perm. app. filed.* "Insignificant nondisclosures will not give rise to a presumption of prejudice." *Akins,* 867 S.W.2d at 356 n. 12. A presumption of bias "may be dispelled by an absence of actual favor or partiality by the juror." *Carruthers*, 145 S.W.3d at 95 (citing *State v. Taylor,* 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983)). "Whether a juror's partiality may be presumed from the circumstances is a question of law." *Smith v. State*, 357 S.W.3d 322, 348 (Tenn. 2011).

Here, it is unnecessary to decide whether a presumption of prejudice was raised, because any such presumption was sufficiently dispelled by an absence of actual bias or partiality. The juror explained that she worked in the pharmacy, that Defendant's mother worked an opposite shift, and that they were present at the Walgreens together only one hour per day. Moreover, the pharmacists were the juror's direct supervisors, despite Ms. Johnson's contention that she was the manager "over the whole store, front and back." In its written order denying Defendant's motion for a new trial, the trial court found

> that [the juror]'s testimony and answers to questions during voir dire were credible, and that she answered all questions truthfully to the best of her memory. The [c]ourt further found that testimony from Yolanda Johnson, [D]efendant's mother, at the Motion for New Trial [hearing], was speculative. The [c]ourt also found that there was no bias proven during the Motion and that [the juror] was questioned fully about the work relationship she had with [Ms.] Johnson during voir dire. [D]efendant was free to use a challenge for cause or a preemptory challenge and instead chose not to.

Defendant has provided no evidence showing how the juror's understanding of her prior working relationship with Defendant's mother affected her ability to be impartial. The trial court found Ms. Johnson's testimony to be "speculative" and the juror's testimony to be "credible." We will not disturb these credibility findings. *See Bland*, 958 S.W.2d at 659.

Moreover, the trial court instructed the members of the jury to base their decision on the evidence presented at trial, and juries are presumed to follow their charge. *See State v. Banks,* 271 S.W.3d 90, 134 (Tenn. 2008). Our appellate courts have not required a new trial under similar fact patterns when a defendant has claimed juror bias. *State v. Robinson,* 146 S.W.3d 469, 522-523 (Tenn. 2004) (finding no "nexus" between defendant and juror who was a deputy jailer and assigned to the defendant's pod for three hours); *Willie Calvin Taylor, Jr.*, 2012 WL 2308088, at *8; *State v. Nelson Troglin,* No.

- 19 -

E2005-02015-CCA-R3-CD, 2006 WL 2633107, at *20 (Tenn. Crim. App. Sept. 14, 2006) (juror, who negligently responded incorrectly at voir dire, was aware of defendant's conviction for a prior homicide, although jury as a whole was only informed of defendant's indictment for the homicide; a new trial was not granted because "all the jurors knew information similar to what [he] knew about the [d]efendant" and "such exposure did not prejudice the [d]efendant's case"), *perm. app. denied* (Tenn. Jan. 29, 2007); *State v. Randall S. Sparks,* No. M2005-02436-CCA-R3-CD, 2006 WL 2242236 (Tenn. Crim. App. Aug. 4, 2006) (juror was the defendant and his mother's former landlord, but did not recognize him during voir dire and had only a passing acquaintance with him, although she was involved in a dispute over the deposit with the defendant's mother), *no perm. app. filed*.

Here, we cannot say that one juror's understanding of her prior working relationship with Defendant's mother fatally tainted the jury's verdict. Defendant is not entitled to relief.

*IV. Exclusion of Evidence*

Defendant argues that the trial court erred by refusing to allow Ms. Johnson to testify at trial about Defendant's specific disabilities. He argues that Ms. Johnson's testimony should have been allowed as a lay witness under Tennessee Rule of Evidence 701.

The State responds that Defendant "may not challenge a trial court['s] ruling excluding evidence unless he presented the substance of the evidence and the specific evidentiary basis supporting its admission to the trial court by an offer of proof or it was apparent from the context." Because Defendant "abandoned the line of questioning" and failed to make an offer of proof, the State argues that Defendant waived the issue. The State also contends that Defendant has not sought or established plain error relief.

A. Waiver

We will first address the State's contention that Defendant's argument is waived. Tennessee Rule of Evidence 103(a)(2) provides:

(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .

- 20 -

(2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

Tenn. R. Evid. 103(a)(2). "The purpose of an offer of proof is to enable the appellate court to determine if the trial court's exclusion of the evidence constituted reversible error." *State v. Stacy Lee Fleming*, No. W2009-02192-CCA-R3CD, 2011 WL 1135760, at *6 (Tenn. Crim. App. Mar. 28, 2011), *perm. app. denied* (Tenn. July 14, 2011). "It is well-established that the failure to comply with Rule 103(a)(2) results in a waiver of the issue." *Id.*

The exchange in question was as follows:

[TRIAL COUNSEL]: All right. You said [that Defendant is] disabled. What type of disability does he have?

[THE STATE]: Your Honor, I'm – I'm –

[TRIAL COUNSEL]: Okay.

[MS. JOHNSON]: He's --

THE COURT: Objection sustained.

[TRIAL COUNSEL to witness]: All right. You can't answer that. All right?

Here, we believe it is "apparent from the context" that the content of the information excluded includes Defendant's specific disability or disabilities. Moreover, at Defendant's sentencing hearing, Defendant's mother testified that Defendant suffered from PTSD, bipolar disorder, internal impulse disorder, and severe depression. Therefore the trial court was aware of Ms. Johnson's testimony when it subsequently denied Defendant's motion for new trial. Thus, no further offer of proof is required under Tennessee Rule of Evidence 103(a)(2), and Defendant has not waived this issue. The State offers no authority to support its contention that "abandoning a line of questioning"

after the trial court has sustained an objection to that questioning waives the issue. Therefore, we will address the issue on plenary review.

## B. Relevance and Lay Witness Testimony

In its written order denying Defendant's motion for a new trial, the trial court stated that it excluded Ms. Johnson's testimony for both lack of qualifications and lack of relevance, stating:

> Besides lacking qualifications to give such an opinion, there was no foundation established to show how the evidence would have been relevant at trial to show [D]efendant's guilt or innocence or any fact at issue during trial; no attempt was made by [D]efendant to raise the issue of competency to stand trial either before, during or after the trial.

Despite the trial court's findings, Defendant argues on appeal that he established a proper foundation and that the testimony was relevant. He argues that he laid the proper foundation for such questioning of Ms. Johnson by showing that "Ms. Johnson was his mother, she was his payee for purposes of Social Security benefits[,] and he was her dependent." Defendant also contends that Ms. Johnson's testimony would have been relevant because her testimony "would have aided the trier of fact in determining whether the statement given by [Defendant] was a false statement" and would have explained "why [Defendant] would have given a false statement confessing to aggravated robbery to free one who was not his relative."

In order for evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403.

A lay witness may give testimony in the form of opinions or inferences if the testimony is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701. "If an opinion is based upon a lay witness's own observations, his or her conclusions require no expertise and are within the range of common experience, the opinion is admissible." *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007); *see also State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). When a trial court excludes evidence on an evidentiary basis rather than a constitutional basis, "the appropriate standard of review on direct appeal is whether the record clearly

demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019).

Here, Defendant's arguments are specious. Defendant has not shown how Ms. Johnson's testimony regarding his specific mental health issues would aid the trier of fact regarding his credibility, his motive to give a false confession, or any other "determination of a fact in issue." Tenn. R. Evid. 701(a)(2). The trial court acted within its discretion by excluding her testimony, and Defendant is not entitled to relief.

### V. Sentence Length

Defendant argues that the trial court erred by failing to impose the minimum sentence of eight years. The State responds that the trial court acted within its discretion by sentencing Defendant to an in-range sentence of ten years' incarceration with an eighty-five percent release eligibility.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2019).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code

Ann. § 40-35-210(e) (2019); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2019), Sentencing Comm'n Cmts.

The sentence range for a Range I standard offender for a conviction for aggravated robbery, a Class B felony, is eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (2019). Aggravated robbery has a release eligibility of eighty-five percent. Tenn. Code Ann. § 40-35-501(k)(1) (2019).

Here, the trial court applied enhancement factor (1), that Defendant had a history of prior criminal convictions or criminal behavior, in addition to that which was necessary to establish his range as a standard offender, and factor (13), that Defendant committed the conviction offense while out on bond for another offense. Tenn. Code Ann. § 40-13-114(1), (13) (2019). The trial court did not grant much weight to Defendant's youthfulness under mitigating factor (6), that Defendant, because of youth or old age, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113(6) (2019). In sentencing Defendant to ten years, the trial court noted that "a lengthy period of time [was] necessary to avoid depreciating the seriousness of the offense and to deter others."

The record supports the trial court's findings that Defendant had a history of criminal behavior and that he was out on bond for another offense at the time he committed the aggravated robbery. Defendant's presentence report indicates that he had prior convictions for possession with intent to sell or deliver a schedule IV controlled substance, casual exchange of a schedule IV controlled substance, driving on a suspended license, violation of the financial responsibility law, and theft of property valued under $500. Moreover, mitigating and enhancement factors are advisory only, and the weight to be given to those factors is entirely within the trial court's discretion. *Bise*, 380 S.W.3d at 701; *Carter*, 254 S.W.3d at 345. The trial court acted within its discretion in sentencing Defendant to a mid-range sentence of ten years with an eighty-five percent release eligibility. Defendant is not entitled to relief.

*VI. Denial of Motion for New Trial*

Defendant states that, pursuant to all previous arguments, the trial court erred in denying his motion for new trial. The State responds that, pursuant to all previous arguments, the trial court properly denied the motion for a new trial. We agree with the State. Pursuant to our prior analysis herein, the trial court acted within its discretion in denying Defendant's motion for new trial. Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE